Bernard MARCHESANI, Appellant,

v.

Sub Nom. Gary McCUNE, Warden, United States Penitentiary, Leavenworth, Kansas, Appellee.

No. 75–1325.

United States Court of Appeals, Tenth Circuit.

Argued Jan. 26, 1976.
Decided Feb. 17, 1976.

James R. Andary, Hall & Andary, Detroit, Mich., for appellant.

Mary K. Briscoe, Asst. U. S. Atty., Topeka, Kan. (E. Edward Johnson, U. S. Atty., Topeka, Kan., on the brief), for appellee.

Before HOLLOWAY, BARRETT and DOYLE, Circuit Judges.

BARRETT, Circuit Judge.

Bernard Marchesani appeals from the dismissal of his petition for habeas corpus wherein he seeks review of two 1971 convictions of conspiracy to collect and attempting to collect an extension of credit by extortionate means in violation of 18 U.S.C. § 894. He is incarcerated in the United States Penitentiary located at Leavenworth, Kansas.

Marchesani alleges that he has been denied due process rights guaranteed him in the Fifth Amendment to the Constitution of the United States by reason of his classification as a "Special Offender" in the records of the Bureau of Prisons in that: (a) he was so classified absent a due process hearing, (b) because of the "special offender label" he has suffered "dire consequences" which include in-prison delays in obtaining preferred job assignments, transfers to the Honor Camp or one of the federal correctional institutions or social furloughs and (c) "in all probability" the classification shall deprive him of an early parole.

The District Court dismissed the petition without a hearing. Chief Judge Brown filed a Memorandum and Order. He held that Marchesani's reliance upon *Catalano v. United States,* 383 F.Supp. 346 (D.Conn.1974) and *Masiello v. Norton,* 364 F.Supp. 1133 (D.Conn.1973) was misplaced. While acknowledging that the court in both cases did order that the prisoners be granted hearings with opportunities to call witnesses and present evidence following their administrative classification as "Special Offenders", Judge Brown observed that the classification in both cases rested upon unsupported allegations in presentence reports of "possible connections to organized crime". The court properly distinguished

those decisions from the instant case in that the Marchesani classification as a "Special Offender" was based upon the nature of his *convictions,* namely conspiracy to extort by threats of bodily harm, which the court found to be a sound basis for classification. Further, the trial court held that the classification of prisoners rests within the sound discretion of the Attorney General by virtue of the authority vested in him under 18 U.S.C. § 4001 and that it remains a necessary tool in the management and control of the penal and correctional institutions. We agree.

■ The "Special Offender" status applies to "certain special categories of offenders who require greater case management supervision than the usual case". Bureau of Prisons Statement 7900.47 (April 30, 1974). The *duty* to classify inmates rests with federal prison officials.

18 U.S.C. § 4081 provides:

The Federal penal and correctional institutions shall be so planned and limited in size as to facilitate the development of an integrated system which will assure the proper classification and segregation of Federal prisoners according to the nature of the offenses committed, the character and mental condition of the prisoners, and such other factors as should be considered in providing an individualized system of discipline, care, and treatment of the persons committed to such institutions.

The District Court and the prison authorities were fully cognizant of the facts surrounding Marchesani's convictions by reason of the opinion entitled *United States v. Marchesani,* 457 F.2d 1291 (6th Cir. 1972). The court there observed that Marchesani had been engaged in a so-called "juice" racket involving the extension of loans to individuals at illegal interest rates, the collection of which involved Marchesani's employment of fear tactics to coerce the victims into paying the interest or "juice" when due; and that he had collected great sums of money from various victims, some of whom were beaten and placed in great fear for their lives and the lives of their families.

■ When a plaintiff seeks to enjoin or prohibit the activity of a government agency, his case must contend with the well-established rule that the government has traditionally been granted the widest latitude in the dispatch of its own internal affairs. *Cafeteria Workers v. McElroy,* 367 U.S. 886, 81 S.Ct. 1743, 6 L.Ed.2d 1230 (1961). Accordingly, when due process contentions are raised relative to the operation, maintenance and administration of the penal system, the courts should be acutely aware that caution must be exercised in achieving a careful balance of the interests of that system as against the interests of the prisoners. *Wolff v. McDonnell,* 418 U.S. 539, 94 S.Ct. 2963, 41 L.Ed.2d 935 (1974).

In *Pell v. Procunier,* 417 U.S. 817, 94 S.Ct. 2800, 41 L.Ed.2d 495 (1974), Mr. Justice Stewart, writing for the majority, stated in pertinent part:

We start with the familiar proposition that "[l]awful incarceration brings about the necessary withdrawal or limitation of many privileges and rights, a retraction justified by the considerations underlying our penal system." *Price v. Johnston,* 334 U.S. 266, 285, 68 S.Ct. 1049, 1060, 92 L.Ed. 1356, 1369 (1948). See also *Cruz v. Beto,* 405 U.S. 319, 321, 92 S.Ct. 1079, 1081, 31 L.Ed.2d 263, 267 (1972). In the First Amendment context a corollary of this principle is that a prison inmate retains those First Amendment rights that are not inconsistent with his status as a prisoner or with the legitimate penological objectives of the corrections system. . . . central to all other corrections goals is the institutional consideration of internal security within the corrections facilities themselves. It is in the light of these legitimate penal objectives that a court must assess challenges to prison regulations based on asserted constitutional rights of prisoners.

417 U.S. at pp. 822–823, 94 S.Ct. at p. 2804, 41 L.Ed.2d at p. 501.

In *Procunier v. Martinez,* 416 U.S. 396, 94 S.Ct. 1800, 40 L.Ed.2d 224 (1974), Mr. Jus-

tice Powell, writing for the court, observed in pertinent part:

> Traditionally, federal courts have adopted a broad hands-off attitude toward problems of prison administration . . . More fundamentally, this attitude springs from complementary perceptions about the nature of the problems and the efficacy of judicial intervention. Prison administrators are responsible for maintaining internal order and discipline, for securing their institutions against unauthorized access or escape, and for rehabilitating, to the extent that human nature and inadequate resources allow, the inmates placed in their custody . . . Suffice it to say that the problems of prisons in America are complex and intractable, and, more to the point, they are not readily susceptible of resolution by decree. Most require expertise, comprehensive planning, and the commitment of resources, all of which are peculiarly within the province of the legislative and executive branches of government. For all of these reasons, courts are ill equipped to deal with the increasingly urgent problems of prison administration and reform. Judicial recognition of that fact reflects no more than a healthy sense of realism . . .
>
> But a policy of judicial restraint cannot encompass any failure to take cognizance of valid constitutional claims whether arising in a federal or state institution.
>
> 416 U.S. at pp. 404–405, 94 S.Ct. at p. 1807, 40 L.Ed.2d at p. 235.

■ The governing rule adopted by this court is much akin to the philosophy above quoted. We have held that the control and management of federal penal institutions lies within the sound discretion of the responsible administrative agency, and judicial review will be granted only upon a showing that prison officials have exercised their discretionary powers in such a manner as to constitute clear abuse or caprice. *Daughtery v. Harris,* 476 F.2d 292 (10th Cir. 1973), cert. denied, 414 U.S. 872, 94 S.Ct. 112, 38 L.Ed.2d 91 (1973); *Rivera v. Toft,* 477 F.2d 534 (10th Cir. 1973); *Black v.*

*Warden, United States Penitentiary,* 467 F.2d 202 (10th Cir. 1972); *United States v. Smith,* 464 F.2d 194 (10th Cir. 1972); *Perez v. Turner,* 462 F.2d 1056 (10th Cir. 1972); *Evans v. Moseley,* 455 F.2d 1084 (10th Cir. 1972), cert. denied, 409 U.S. 889, 93 S.Ct. 160, 34 L.Ed.2d 146 (1972); *Bethea v. Crouse,* 417 F.2d 504 (10th Cir. 1969); *Coppinger v. Townsend,* 398 F.2d 392 (10th Cir. 1968); *Graham v. Willingham,* 384 F.2d 367 (10th Cir. 1967).

■ It is the duty of those charged with the administration of federal prisons to see that prisoners are treated properly, giving due recognition to the fact that rights and privileges which are not constitutionally guaranteed must necessarily be varied in application in order to accommodate the particular needs and exigencies of the penal environment. Prisoners are, by definition, prisoners. Many "in house" regulations and decisions of prison authorities which may be considered as deprivations of "property" or "liberty" under other circumstances and environs, are necessary in order to protect the prisoner, to protect other prisoners, and to operate the institution. Many prisoners are unpredictable. Prison setting is, at best, tense. It is sometimes explosive, and always potentially dangerous. The judgments of prison authorities, under such circumstances, are often predicated on "educated" estimates or guesses resting on suspicion. The overall atmosphere does not blend with many of the traditional "due process" requirements. The problem was perhaps best placed in focus in *Cafeteria Workers v. McElroy, supra :*

> . . . consideration of what procedures due process may require under any given set of circumstances must begin with a determination of the precise nature of the government function involved as well as of the private interest that has been affected by governmental action.
>
> 367 U.S. at 895, 81 S.Ct. at 1748, 6 L.Ed.2d at 1236.

*See* also *Morrissey v. Brewer,* 408 U.S. 471, 92 S.Ct. 2593, 33 L.Ed.2d 484 (1972).

The record before us does not support appellant's claim for habeas corpus relief. We hold that the District Court did not err in finding that the record does not show an abuse of discretion.

WE AFFIRM.