Frank PUGLIESE, Petitioner,

v.

W. Raymond NELSON, Warden, Federal Correctional Institution, Danbury, Connecticut, and Norman Carlson, Director, United States Bureau of Prisons, Respondents.

Civ. No. B–79–97.

United States District Court, D. Connecticut.

May 15, 1979.

Donald Squires, Law Student, Yale Legal Services, New Haven, Conn., for petitioner.

Richard Blumenthal, U. S. Atty., Cheryl B. Wattley, Asst. U. S. Atty., New Haven, Conn., for respondents.

ELLEN B. BURNS, District Judge.

## MEMORANDUM OF DECISION

Petitioner, an inmate at the Federal Correctional Institution at Danbury, Connecticut, is serving a ten-year sentence for violation of the federal narcotics laws. He began his sentence in the United States Penitentiary at Lewisburg, Pennsylvania, in May, 1974, and was transferred to Danbury in December, 1977.

In August, 1976, some 26 months after his sentence began, while petitioner was still at Lewisburg, he received notice from the Bureau of Prisons that he was tentatively designated a "Central Monitoring Case" (CMC), a classification developed by the Bureau of Prisons to insure monitoring of and control over the transfer and community activities of inmates who fit certain categories which the Central Office has determined pose special management problems. *See* Federal Prison Policy statement 7900.-53A.

Petitioner was designated a Category B Central Monitoring Case. Category B includes "[i]nmates who by reason of their offense, criminal record, institutional behavior, or notoriety require especially close supervision." *Id.*

There are three subcategories of CMC, Category B: Category B(1) which includes inmates who are extremely dangerous and likely to be disruptive of the daily lives of others; Category B(2) which includes inmates who have threatened government officials; and Category B(3), the category in which petitioner has been placed, which includes

inmates who have received unusual publicity because of the nature of the crime, arrest, trial, prisoner status, or who have been involved in criminal activity of a sophisticated nature or whose presence in the community or in minimum security institutions might depreciate the seriousness of the offense or promote disrespect for the law.

Inmates who have been designated CMC, Category B–3, are subject to delays or refusals when they seek social furloughs, participation in community activities, release to halfway houses and transfers to other correctional institutions. Before any of these are allowed to a prisoner with a Category B designation, permission must be obtained from the Central Office.

When petitioner received notice of his tentative designation as a Category B–3 Central Monitoring Case, he submitted a request for administrative remedy to the Warden at Lewisburg, objecting to the designation. The request was denied and in December, 1976, petitioner was notified that the designation had been approved by the Central Office.

Shortly thereafter petitioner appealed his designation to the Central Office, and the appeal was denied.

In October, 1978, nearly a year after his transfer to Danbury, petitioner was classified as "community custody" by his Unit Team, and it was recommended to Warden Nelson that petitioner be granted a Christmas furlough. Warden Nelson denied the

request for furlough, telling petitioner the denial was due solely to his B–3 Central Monitoring designation.

After denial of the furlough, petitioner again appealed his Central Monitoring status to the Central Office, claiming that according to *Catalano v. United States*, 383 F.Supp. 346 (D.Conn.1974), the fourteenth amendment requires that a hearing be held before a person may be designated a central monitoring case, Category B–3. The appeal was denied. Having exhausted his administrative remedies and having suffered an injury of constitutional magnitude (*see Coppola v. United States Attorney General*, 455 F.Supp. 15 (D.Conn.1977)), petitioner now reiterates his due process claims in this petition for a writ of habeas corpus.

Neither party in this case questions that procedures set forth in Policy Statement 7900.53A have been followed. The sole legal issue here is whether the procedures of that policy statement provide the due process which must be given an inmate who is designated CMC, Category B.

The predecessor of the CMC, Category B classification was the designation "Special Offender" or "Special Case." Inmates designated Special Offender faced the same difficulties in obtaining permission to participate in community activities, social furloughs, halfway houses and prison transfers as do Category B, Central Monitoring cases. In addition, 28 C.F.R. § 2.20 (June 5, 1974) provided that CMC designation be a consideration in a decision to grant early parole. (28 C.F.R. § 2.20 (August 1, 1977) now makes no reference to CMC status.)

In 1975, the Second Circuit decided *Cardaropoli v. Norton*, 523 F.2d 990 (2d Cir. 1975) which upheld and gave wholehearted approval to Judge Zampano's learned and thorough analysis in *Catalano v. United States*, 383 F.Supp. 346 (D.Conn.1974). These cases found the procedures then in use by the Bureau of Prisons to designate an inmate a Special Offender unconstitutional in light of the "grievous loss" which accompanied the designation. In setting forth the due process protections required before the designation could be imposed,

the court required at a minimum that the inmate is to be given ten days' notice that the classification is contemplated, together with a reason for the classification and a brief description of the evidence relied on by the prison authorities. In addition, the inmate is to be afforded a personal appearance before an impartial decisionmaker during which appearance the inmate is to be given the opportunity to call witnesses and present documentary evidence, subject to the hearing officer's discretion " 'to keep the hearing within reasonable limits and to refuse to call witnesses that may create a risk of reprisal or undermine authority, as well as to limit access to other inmates to collect statements or to compile other documentary evidence.' " *Catalano*, supra, at 353, quoting *Wolff v. McDonnell*, 418 U.S. 539, 566, 94 S.Ct. 2963, 41 L.Ed.2d 935 (1974).

This hearing, however, is not to be a full-blown trial-type hearing. Except in the unusual case where the decisionmaker cannot rationally determine the facts, the inmate need not be given the opportunity to confront or cross-examine witnesses adverse to him. Likewise, the inmate need not be furnished counsel. However, if the issues are complex or the inmate appears unable to collect or present his case he may be permitted to retain counsel.

There is no need to record the proceedings.

After the hearing, the decisionmaker must render a written decision setting forth the reasons for his decision and this is to be subject to review by the Chief of Classification at the institution, the Warden, and ultimately, the Bureau of Prisons.

In response to *Cardaropoli*, the Bureau of Prisons completely revised its procedures and issued Policy Statement 7900.53 (now 7900.53A, but substantially identical to 7900.53) which requires that an inmate receive notice of the contemplated designation and be advised of the basis for it, including specific reference, in a B–3 CMC case, "to the sophisticated criminal involvement, that is, the crime for which the inmate was convicted or explicit evidence of

other sophisticated activity." The inmate is then given an opportunity to present written or oral objections or responses to the evidence against him. The information justifying the classification, together with a summary of an inmate's oral statements and any written evidence submitted by the inmate, are forwarded to the Central Office for decision. Appeal from the Central Office decision may be made directly to the Central Office.

Clearly, these procedures deviate from the requirements of *Catalano* and *Cardaropoli.* The question, then, is whether they satisfy the requirements of the fifth amendment, regardless of the deviation.

■ Before answering this question, however, several threshold issues must be resolved. First, respondents maintain that the law which should be applied to petitioner's case is the law of the Third Circuit, since petitioner was incarcerated there at the time of his original designation as a CMC. This court's recent case of *Durso v. Nelson,* Civil No. B–78–311 (D.Conn. Dec. 8, 1978) involved an inmate who, like petitioner, was designated a CMC at the Federal Penitentiary at Lewisburg. He litigated the constitutionality of Policy Statement 7900.53 in the Middle District of Pennsylvania which held that the procedures contained therein met the requirements of the Due Process Clause. *United States ex rel. Durso v. Fenton,* Civil No. 76–1381 (M.D. Pa.), *aff'd mem.,* 568 F.2d 771 (3d Cir. 1977). After he was transferred to F.C.I., Danbury, he sought, through a petition for habeas corpus, to re-litigate the constitutionality of the procedures used to designate him a CMC. This court held that the issue was not justiciable, and the Second Circuit vacated the judgment and remanded the case "for consideration of appellant's constitutional claim on the merits." *Durso v. Nelson,* No. 79–2008 (2d Cir. Mar. 27, 1979). There is nothing in this order which indicates to the court that the Court of Appeals intended that law other than Second Circuit law should be applied in considering the constitutional claim. Therefore, the court believes Second Circuit law controls both the *Durso* case and this case.

■ Secondly, defendants maintain that the 1976 decisions of *Meachum v. Fano,* 427 U.S. 215, 96 S.Ct. 2532, 49 L.Ed.2d 451 (1976) and *Moody v. Daggett,* 429 U.S. 78, 97 S.Ct. 274, 50 L.Ed.2d 236 (1976) undermine the Second Circuit's position in *Cardaropoli.* In *Meachum,* the court held that state prisoners had no right to due process before they were transferred from one institution to another because they had no entitlement to remain in any particular prison. The key factor in *Meachum* was the existence of total discretion on the part of prison officials in the area of inmate transfers. So long as the officials had discretion to transfer the inmate "for whatever reason or for no reason at all," there was nothing which would raise expectations in a prisoner substantial enough to trigger due process protection, 427 U.S. at 228, 96 S.Ct. 2533, 2540.

As evidence of *Meachum's* applicability to this case, defendants point to *Moody v. Daggett,* 429 U.S. 78, 88, 97 S.Ct. 274, 279, 50 L.Ed.2d 236 (1976) where the court observes in footnote 9 that

> [p]etitioner also argues that the pending warrant and detainer adversely affect his prison classification and qualification for institutional programs. We have rejected the notion that every state action carrying adverse consequences for prison inmates automatically activates a due process right. In *Meachum v. Fano,* 427 U.S. 215, 96 S.Ct. 2532, 49 L.Ed.2d 451 (1976), for example, no due process protections were required upon the discretionary transfer of state prisoners to a substantially less agreeable prison, even where that transfer visited a "grievous loss" upon the inmate. The same is true of *prisoner classification* and eligibility for rehabilitative programs in the federal system. Congress has given federal prison officials full discretion to control these conditions of confinement, 18 U.S.C. § 4081, and *petitioner has no legitimate statutory or constitutional entitlement sufficient to invoke due process.* [emphasis added].

Defendants maintain that this language is dispositive of this case and overrules *Cardaropoli*. They also argue that the due process provided by Policy Statement 7900.53A is therefore in excess of constitutional requirement.

This court disagrees because it finds that the facts in the present case distinguish it from *Moody*. The prisoner in *Moody* alleged an adverse effect on his classification resulting from the lodging of a detainer against him. In that instance, the prison officials had full discretion to classify the prisoner however they wished. That this is true is confirmed by Federal Prison Policy Statement 7500.72 which was in effect at the time of the *Moody* decision (and remains in effect today) and which states, in essence, that the lodging of a detainer by itself should not affect an individual's classification and that the prison authorities must determine on an individual basis what effect, if any, will be had on the inmate's classification by reason of the nature of the offense committed or allegedly committed in the detaining jurisdiction and by reason of other material relating to the detainer (*Cf.* F.C.I. Danbury Policy Statement 7300.-39B, page 2, Detainers, effective 10/6/78).

■ In the instant case, the prison authorities do not have full discretion. It is, of course, true that 18 U.S.C. § 4081 grants full discretion to prison officials to control classification of federal prisoners. But when these officials decide in their discretion to issue policy statements concerning and, in effect, guiding and controlling their actions, then this court believes that such policy statements are sufficiently in the nature of a statute to fall within *Meachum*'s recognition that statutory or constitutional restrictions on discretion create an entitlement sufficient to invoke due process. *Accord Arsberry v. Sielaff*, 586 F.2d 37 (7th Cir. 1978) (overruling *Solomon v. Benson*, 563 F.2d 339 (7th Cir. 1977)); *Walker v. Hughes*, 558 F.2d 1247 (6th Cir. 1977). *Cf. Drayton v. McCall*, 584 F.2d 1208, 1215–18 (2d Cir. 1978) (distinguishing *Moody* and holding that Parole Commission regulations can trigger an inmate's justifiable expecta-

tion and that that expectation is a constitutionally cognizable entitlement under "the Supreme Court's recent rather formalistic emphasis on governmentally established entitlements [footnotes omitted]". *Id.* at 1215.) *See also Cofone v. Manson*, 594 F.2d 934, 939 n. 6 (2d Cir. March 27, 1979) (holding by negative implication that a Connecticut Department of Corrections Administrative Directive could in some instances form the basis of an entitlement.)

Policy Statement 7900.53A, quoted in pertinent part above, restricts the discretion of the prison authorities to designate inmates as Central Monitoring, Category B–3. The officials must make definite findings that unusual publicity has been received, that crime of a sophisticated nature has been committed or that the presence of the prisoner in the community or in a minimum security institution might depreciate the seriousness of the offense or promote disrespect for the law. Only if one of these factors is found may the inmate be designated Central Monitoring, B–3.

■ The court holds that an inmate has an entitlement in not being designated a B–3 case, with its attendant strictures on access to permission for furloughs, transfers, halfway house placement and participation in community activities, without being accorded due process.

The preliminary questions having been disposed of, the issues now are whether the procedures contained in Policy Statement 7900.53A satisfy the requirements of the Due Process Clause and whether petitioner's actual experience in his own particular designation as a CMC can withstand constitutional scrutiny.

Nearly identical issues confronted Judge Newman in *Coppola v. United States Attorney General*, 455 F.Supp. 15 (D.Conn.1977). In that case, Judge Newman held that the notice given the inmate of the evidence forming the basis for the designation was not sufficient for the inmate to prepare his objections and responses. He also held that a hearing is necessary to "bring the issues [out] into the open, so that a prisoner can respond meaningfully instead of guessing

at what he should include in his written submission." 455 F.Supp. at 20.

Finally, Judge Newman held that the reasons given Coppola for his designation were not in keeping with the *Catalano* and *Cardaropoli* requirements that reasons for the decision be given with "at least minimal specificity." For these reasons, he ordered that the CMC designation be stricken and that it not be reimposed unless the *Catalano-Cardaropoli* procedures were followed.

In *Coppola*, the inmate was given several notices of his classification as CMC, Category B–3. In each case, the reasons given him were simply repetitions of the broad conclusory language of the policy statement itself:

> You have been involved in criminal activity of a sophisticated nature, and your presence in the community or in minimum security institutions might depreciate the seriousness of the offense or promote disrespect for the law.

455 F.Supp. at 17, and:

> Offenders who by reason of their offense, criminal record, institutional behavior, or notoriety require especially close supervision. Offenders who have received unusual publicity because of the nature of the crime, arrest, trial, prisoner status, or record of involvement in criminal activity of a sophisticated nature or whose presence in the community or in minimum security institutions might depreciate the seriousness of the offense or promote disrespect for the law.

*Id.* at 19.

In the case before this court, petitioner was given a much more explicit statement of reasons for the designation:

> You are serving a 10 year adult sentence for Narcotics Violation. We have information that this involved your participation in large-scale sophisticated criminal activity in that you were part of a major narcotics conspiracy and functioned as a wholesaler who dealt in multi-kilo quantities of heroin.

The court finds that this notice, while a great improvement over the notice given Coppola, is still constitutionally deficient in that it is ambiguous. The phrase "We have information" is not clear enough to inform the inmate whether the basis for the CMC designation is confined to evidence contained in the court record of defendant's case or whether the Bureau is considering other evidence as well. The notice to the inmate must be clear on this point; he should not have to guess about the nature or source of the evidence against him. If the evidence is other than that adduced at trial or agreed to upon a plea of guilty, the inmate must be told its tenor and its source.

Furthermore, for Category B Central Monitoring cases, at least, *Cardaropoli* is still the law of this Circuit. (*Cf. Mercado v. Nelson*, Civil No. B–78–420 (D.Conn. Feb. 6, 1979) which concerns issues similar to those presented here but in the CMC, Category A, context).

Therefore, the inmate must be given the opportunity for a hearing at which he may present witnesses and evidence on his own behalf. Because the opportunity for a hearing is meaningless unless the inmate is notified of it, the notice of tentative designation must not only meet the requirements set forth above, it must also inform the inmate that he has a right to a hearing where he may present such evidence and witnesses as he may choose. This notice must be given at least ten days in advance of the hearing date.

Finally, the inmate must be given the opportunity for a hearing even if the evidence relied upon by the Bureau is precisely that evidence which was presented at trial. The inmate may opt against a hearing but he must have the chance to choose. It must be remembered that evidence which could not be admitted at trial may well be presented at this hearing and may have a bearing on whether CMC designation is appropriate.

Accordingly, it is ordered that a writ of habeas corpus will issue discharging the petitioner unless within thirty days the Central Monitoring Case classification is removed. The classification may not be reimposed unless the Bureau follows the proce-

dures mandated by *Catalano* and *Cardaropoli* and discussed herein.

Furthermore, the court takes notice that petitioner currently has pending before the Central Office a request for a furlough to attend his daughter's high school graduation on June 9, 1979. In ruling on this request, the Bureau may not consider the invalid CMC classification. Rather, this request shall remain pending so that a new request need not be made in the event a valid CMC classification is imposed on petitioner before June 9, 1979. Absent a valid imposition of the classification, petitioner's request for a furlough shall be entertained by the authorities at F.C.I., Danbury, and shall be processed in the same manner as requests made by other non-CMC inmates.

SO ORDERED.